May it please the court, Mike Dowling on behalf of the appellant William Robert Jeffery and I'm joined on the briefs by Mr. Brad Polk and Ms. Anya DeJoy. Between October 2019 and January 2020, William Jeffery used a Microsoft search engine on multiple occasions in the privacy of his home. Microsoft sent records of Mr. Jeffery's internet search activity to the government. The government agents viewed those records on two separate occasions without a warrant. Based on the information contained in those records, the government then requested and obtained a state search warrant from a North Carolina Superior Court judge. After the search and the products of that search were brought to bear, Mr. Jeffery was charged and convicted in federal court of access with intent to view child pornography. The district court should have granted Mr. Jeffery's motion to suppress for at least three reasons, your honors. First, under Katz v. United States and Carpenter v. United States, Mr. Jeffery had a reasonable expectation of privacy in the searches he conducted and the government therefore needed a warrant before it reviewed the records of those searches and that did not happen in this case. Second, in Carpenter, as this court is well aware, the Supreme Court refused to extend the third party doctrine to historical cell site location records, even though at some admitted level those historical cell site location records had been shared with a mobile service provider. For essentially the same reasons, in this case, this court should not extend the third party doctrine to search engine records. And third, for similar reasons, the private search doctrine should also similarly not be extended to the records of Mr. Jeffery's search engine activity in this case. On the third one, I'm sorry, I missed the for similar reasons. Can you just spell that out? Why does the the private search doctrine not apply here? Absolutely, your honor. So the private search doctrine and the third party doctrine are substantially interrelated and intertwined. They are, the purpose behind both of them is essentially to indicate that the law will not continue to uphold an expectation of privacy in instances where that expectation of privacy has either been defeated voluntarily, for instance, or perhaps unilaterally by some other third party. It's our position that that did not happen in this case. There was no frustration of Mr. Jeffery's privacy interests in the search records by virtue of him simply conducting Internet activity on Google. I understand what you're saying about maybe some kind of overlap in some of the rationales, but they seem, third party versus private search, they are different, right? If a private person breaks into my house where I undoubtedly have a reasonable expectation of privacy, goes through all my most intimate papers, clearly covered, and then walks out the door and gives those papers to the government, well, I had a reasonable expectation of privacy, but it's still a third party, it's still a private search case, right? Your logic is sound, your honor. The problem here that I believe exists and the distinction between that hypothetical that you're given is the one that Carpenter Court has identified. In a trilogy of cases, Carpenter, Riley, Jones, we're living in a different world from the case where a FedEx employee punctures a box and then conducts a private search and discovers contraband. We're talking about digital technology, and this is a sea change both in the scope of the amount of information that's subject to government acquisition, but also where the technology is far different in kind, if you'll accept my hypothetical, your honor, than the FedEx employee who maybe unwittingly punctures the box. This technology is happening, like in Carpenter, it's happening behind the scenes, it's happening pervasively, it's happening automatically, and so we don't think of those things, I don't think average people think of those things on the street as an invasion of their privacy in the same way a FedEx employee who opens up a box and discovers contraband has invaded their privacy. These are, the Carpenter Court teaches, it's an important factor. If people don't think of it as an invasion of their privacy, like how is that a good point for you? If there's no, like one of the prongs of a reasonable expectation of privacy is that you have a subjective expectation of privacy. So I think it's, again, I think that the realm of technology is qualitatively different than the cases, the third-party doctrine cases, that are, you know, born in the 80s and you're talking about non-technological circumstances. Here you have something where most of the time we're not even talking about a human being. Mr. Jeffrey was not in the privacy of his home, he wasn't broadcasting his searches to a screen in Times Square such that everyone would know that this is what's happening. He was not willingly giving up the privacy that I think he anticipated in that circumstance and that quite frankly all of us would anticipate. And so it's an automatic aspect that's, it's pervasive and it's baked into the actual, the technology and the court has said we can't just, the language from Carpenter is, we can't just mechanically apply these doctrines to defeat expectations of privacy. We have to look back, we have to go back to the founding and what was the purpose of the Fourth Amendment? It was to prevent these pervasive government surveillance tactics, the general warrant, the writs of assistance. How is it surveillance? He sends the pictures to someone conceitedly under Richardson, not a state actor, and says please look at these for me. I want you to look at them and see if you can find other things that are similar. That's not surveillance, that's just answering a request. So I would push back respectfully, Your Honor, on the notion that he's sending anything to a third party and the language that's been used is he's uploaded these files and I think that may be where some of the discussion occurred below. He's inviting someone to scrutinize the photos in question to see if they can, whoever this AI person is, but I'm kind of, what's it called, anthropomorphic. He's inviting scrutiny by someone, not himself, of these photos. So respectfully, Your Honor, that's one way someone could interact with this technology. Another way was discussed, and I actually think it was the government's theory of this case, was not necessarily that you had to have a file and you send it to Microsoft and then they download it. In other words, you have possession of it. Another way on JA402, Detective Chappell, who was the forensic specialist who did the forensics, testified that you could also just, if you see something on the internet, you see an image of a political figure you like or dislike. You see an image of whatever you're searching for, you can right-click on that and a drop-down box will come up and it'll say, search the internet for this. And at JA402, that appears to have been the ultimate theory that the government settled on in this case. It's not an affirmative, you're clicking, you're affirmatively saying, this one, send it out to see if you can find similar stuff. That just seems like the exact opposite of Carpenter, where it was so concerned that there was no affirmative act required to get your cell site location out in the world. So, I think Carpenter recognizes that cell phones, which we all have, they're a pervasive part of our life, they're constantly sending this information, I think, in a very similar way to the information that's sent if he right-clicks on a file and says, search for this. The other aspect of this technology, as you all know, you don't require any sort of contractual waiver of your privacy expectations when you're using a widely disseminated search engine. So, you and I could walk into a public library, never put our name in there, never put any personally identifying information and search Google. And I believe most people, if you told them, hey, did you know, according to the government, that's fair game. Everything that you just typed into that Google search query, they don't need a warrant, they don't need any process at all. If they decide, hey, that's been shared with Google, they can go get that now. That's the implications, that's the slipping slope we're staring down at this point. And so, the question becomes, has Mr. Jeffrey affirmatively, voluntarily shared this information with Google? You don't need a Google know how they've got buried in the fine print? Obviously, I think those are, you know, collusive and nobody ever reads them, but we don't even have that in this case. We have a publicly available search engine that most of us, if the court would give me a little latitude on the record, I mean, Google processes two trillion search queries every year. We're talking about a massive amount of data, about essentially every internet user in the world. And so, the scope is, it's just mind-blowing if you think about it. And then the nature of it is so far more personal than the nature of the data in Carpenter. It's far more personal than the nature of the data in Chartree. It's, who are you in love with? How many children do you have? Do you have a loathsome disease? What are your politics? Do you harbor any unpopular opinions? People punch all this stuff into the internet. And what the government is contending here is, they don't need a warrant to get that. They don't need, they don't even need a subpoena, I guess. There's no process required because somehow, when you're sitting at your computer typing those things into Google, you know ultimately that the government can come knocking and get that stuff. And so, you know, you just don't have an expectation of privacy in those things. But isn't it though that you do know though that you are sharing with your search engine platform? I think the predicate for that conclusion, Judge Gregory, would be if they'd warn you that this is being shared. But again, you don't, when you go into Google, you don't sign up and say, I understand you're going to send this to law enforcement. There's no affirmative disclosure and knowing involuntary disclosure of the fact that you're now waiving your rights to everything you type into that search query box. Well, that's the same thing it is. Let's take it out of the, you know, the cyber world and just take it just to plain world, I guess, that I know about. You tell somebody, a human being something. Don't you know that you may not, you don't think that they're going to tell someone else, but you do know that you have shared it with that person. And that's what they're saying. That's basically, that party is then sharing, they share it with someone else. And they're not the agent when they received it and nor when they gave it, but the inquiry was made. If that's the case, I lose that case every day and twice on Sunday. But that case is materially distinguishable from a case in the digital technology realm because I'm not on the street talking to a confederate sharing my personal private secrets. I'm in my home at my home office wondering, oh shoot, I've got this weird rash or oh shoot, I really, you know, want to know about some really sensitive topic and I type it into Google. It's not being shared in the same way as when I'm on the street talking one-on-one to a living, breathing human being. There's no agency to that. No, it's shared and it's worse because you're sharing it with a world of metadata. I mean, the metadata is unbelievable to go back in terms of what you've done there and go on and on and on and on and on. It's a universe that you're giving it. For example, I mean, you know that, I assume you do, as old as I am, I know this, that you go and make a search and then two days later you pop up advertisement for the same type of genre that you're doing. I didn't ask for this, but they know. Somebody must have told these people that I have an interest because now they want to sell me a product related there too, right? I think it's common sense that most people, they sense something's going on in the background, but again, there's no evidence in this record that Mr. Jeffrey was ever told specifically. He was told that there is a services agreement, but there's no indication he ever signed that or that he ever complied with that or, you know, indicated his assent. You think that's your position? You think that would be required? That he has to deliberately have to say, I think I am giving you permission to share. No, not, I'm telling you, do not share this or either way you want to switch that. You think that has to be done? I think so. I think that Carpenter, again, Carpenter talks about the fact that the records in Carpenter, your cell phone records are sending information right now, and the court said, well, everybody knows that. Everybody knows that that's what's going on, but we're not sharing it in the constitutional sense. We need these things to operate. We need a sphere of privacy and some breathing space to investigate, you know, these kinds of deeply private questions, and the only options we have are to get rid of the phones, which the court said that's just not, you can't live in modern society. This, I think, is far more scary and pervasive for the point you just mentioned, Judge. When you get this data, it's far more broad than location data. It's far more broad than some of these other sources of data, and so I can, if they hand this to you, you know everything about that person, and what we're saying now is the government gets it for anybody they want with no judicial oversight at all. What's the deal with the service agreement? Because there is a service agreement that says this happens, but you're saying your client didn't sign it? I don't believe there's any indication or evidence, yeah, correct. It's, I think that was presented by the government that we have this services agreement, and I think their theory, to the extent one exists, is he implicitly consented to it by using the product, but I don't know that there's any, there's no exhibit in here where William Jeffery signed the services agreement. There's testimony before the district court, and was this ever contested? I don't understand. It was not contested. It said we have a service agreement that nobody has used. You can, anyone can sit down at this computer, and they're not warned beforehand. Like you see some of these. Nobody thinks you have to have like a special warning on your screen every time you use it. There's a service agreement that tells, like, I guess I'm not, but you're saying the fourth amendment requires more. You actually have to be notified each time you use the computer. I'm sure, admittedly, officer of the court, I've never read my mobile services agreement, but I'm sure it said in there for Mr. Carpenter, hey, Mr. Carpenter, you know, if you carry this phone around, we're going to get these records. These are our records, and that was no problem. There was an aggressive argument by the government in, oh, sorry, your honor, my time is up. Well, we've asked you a lot of questions, so I'll give you two or three minutes. If you, if some area knew that you didn't get to at all. Your honor, I think we've discussed the issues extensively. It's our position that this is an issue of first impression. It's an issue of monumental importance because of the amount and the scope of data that we are talking about. We would ask that the court carefully apply the principles of Carpenter, which talk about this is a new era. This is a new realm with these technologies, given how different they are from these cases from the 80s, and not mechanically apply the third-party doctrine and the... Can I ask you, if that's your argument, this is a new area of law, don't apply the old precedent. We need to break some new ground here. I mean, why would exclusion possibly be an appropriate remedy under the good faith exception that's designed for cases exactly like the one you were portraying? There's some old law, but we need to take a new path. I think that's fine, but the evidence still comes in. I think good faith doesn't apply. I think Carpenter clearly put the government on notice that given the amount and nature of this data... That's a different argument. Okay. That they should have gotten a warrant before they saw it. Then, and frankly... So you think the reason the good faith exception under Davis wouldn't apply is because Carpenter makes perfectly obvious that you have to get a warrant in this case? I think that coupled with the fact, your honor, if you look at the chronology here, there's a fairly substantial delay that I've gleaned from looking at when the last tip came in and when they actually go to get a warrant. I think it's about a month. You know, we're not talking about a substantial amount of effort that it would have taken and to have gone and gotten a short warrant to say this is what we have and they just didn't do it here. So I reserve whatever left I have. Yeah, yeah. It's reserved. Thank you, Mr. Dowell. Mr. Bubar. Thank you, your honors, and good afternoon and may it please the court. Dan Bubar on behalf of the United States. Carpenter is not a very new case. It came out in 2018. Additional courts have applied its limitations to the third party doctrine since then. This Murrell case is a 2019 case a year after Carpenter that applied the third party doctrine in a very similar factual scenario to our own. Comes out of the first circuit and in Murrell, the defendant was doing similar activities, your honors, taking child pornography images, putting them on a website called Imgur. Now the facts in that case indicate that he thought he was putting them in a private part of the website, Imgur. Similarly, Nick Mick received cyber tips based upon those postings because Imgur was similarly scanning the things that go on there. And those cyber tips came in and the first circuit said, yeah, we recognize that Carpenter has come out. But they applied that third party search doctrine because the defendant was sharing this child pornography with a third party, a private website, and accepted that and found this threshold issue. There is no reasonable expectation of privacy over those activities where someone's taking an action. This is not walking around the block with a cell phone or through a park. This is not using a cell phone to drive around and share historic cell phone location data. That was Carpenter, admittedly. There are limitations that Carpenter brings. But by its own telling, the Carpenter court is a limited case. It's about a cell phone and historic data. It admits it's not even applying itself to cell phone tower dumps or real time cell phone data. It certainly has not applied itself or is speaking to uploading child pornography images on third party, private websites in violation of a user service agreement. There were a great deal of factual findings that Judge Dever made at the district court about the service terms. The service terms are what Microsoft puts out there to the public. And when you use its services, it says, don't use our product to break the law. You're not allowed to put child pornography images on our You're not allowed to use our products to increase this. We will ban you. We have that option. We have that opportunity. This service agreement also says that they are systematically scanning. This is photo DNA. When someone uses this product, Microsoft Bing, it's not Google. This is Microsoft Bing, an alternative search to Google. When people use that, the service terms say this is an automatic process. We're scanning. If they're going to look for pictures of the White House or the Fourth Circuit, you can search for that automatically. Take this image and look for more across the Internet. When you're doing that, Microsoft has to scan that image and look at that and see what it is. In doing that, it's looking across the bounds of the Internet for more of those. Also in doing that, Microsoft is scanning for illegal images of child abuse images that violate the law. In doing that, it's doing it automatically and systemically. The court found properly that those user terms alert individuals that this is going on and diminishes that reasonable expectation of privacy. Can I ask you a question? I think the box we're in with this part of your argument is about whether there's a reasonable expectation of privacy. Wherever one might come out on it, Carpenter is at least about reasonable expectations of privacy. As I read Carpenter, it has literally nothing to do with the private search doctrine, which is the other ground that the district court relied on. The district court has these two alternative grounds before it even gets to good faith. I think you start your brief with the private search doctrine. Do you have a view as to which would be the more sort of straightforward ground for affirmance? Yes, Your Honor. The court took them in a slightly different order as we're doing today. There's a threshold issue. Was there a reasonable expectation of privacy under the third party doctrine? No search. The analysis can end there. And indeed, Miller is a good example of a case that walks sort of this process through. Threshold issue. No search. No reasonable expectation of privacy. Didn't end in Miller because those were emails. Different case. But yes, I would take them in that order. The order that the judge took them in the court below. No search. Secondly, and he created this factual record, by the way, that is not clearly erroneous as to the reasonable expectation of privacy, the facts therein. Secondly, though, Your Honor, he did. He also found that if Jeffrey had a reasonable expectation of privacy somehow over these images of child pornography that he put out affirmatively, actively to Microsoft, asking to find more against their user terms. If there was some reasonable expectation of privacy, Microsoft is a third, excuse me, I'm saying, is a private party acting as a business. It is not acting at the behest of government. The government doesn't know it's scanning this or doing this or searching for this in this case. This private party search doctrine also was not exceeded by the government. Now there is a Fourth Circuit case that's very much on point as to this second issue. That's Richardson. And in Richardson, it's a little older case, 2010. But in Richardson, this is an AOL case. We used to have AOL that seemed to be at the center of our lives. In AOL, they were scanning these images for child pornography on emails. And the court in Richardson found that if AOL was acting on its own, not at the direction of government, and passive acceptance is not enough, passive acceptance is not enough, it does not violate the Fourth Amendment to receive that tip, to receive those images. The government didn't know of an acquiesce in that private search. The second test is, is a private party assisting the law enforcement or is there a private motivation? Is there a private motivation that that company has? The court made several important factual findings about these issues on the record. First of all, law enforcement did not know of or acquiesce in Microsoft's review. It wasn't directing Microsoft to be doing the scanning and to find these images and to send them along to NCMEC. It didn't know of that, didn't participate in that. Secondly, Microsoft has a strong interest, it found, in wanting child pornography to not be on its servers, to not be a part of its company. It has a reputational interest in excluding those vile images from its servers. It doesn't want any part of that. So the court found, pursuant to Richardson, the government wasn't involved and Microsoft had its own motivations and therefore it's not a violation of the Fourth Amendment. But the next consideration, your honors, is whether the government expanded the scope of the initial review by Microsoft. And there was a pretty clear record made of that as well. The court looked to a number of factual issues. The cyber tips themselves say that there was this eyes-on review and that that had occurred. The testimony was consistent with that as well, that someone reviewed it. And the court found that this was not, again, this alternative finding, but the court found that there is not a Fourth Amendment error or a Fourth Amendment violation in receiving those cyber tips about these two images. Finally, your honors, the court found that if there was some kind of error that was made, and Judge Harris brought this up, if there was some kind of error that was made along the way, exclusion would not be appropriate. It would not be appropriate to throw this out. Under Richardson and under the various cases that have ruled post Carpenter, Miller, others as well, Morrell, the officer was acting certainly in good faith and exclusion would not be appropriate under these circumstances. If your honors have any other questions about either the third-party doctrine or the private The appellant didn't mention the Bill of Particulars motion either. If you have any questions about those, I'd be happy to entertain them. It wasn't even in the reply brief either, your honors. Thank you very much. Thank you, Mr. Buma. Mr. Dowling, you have time reserved. My colleague referenced a case out of the First Circuit, Morrell. I believe that case is factually distinguishable. There's an additional party in that character in that play, the Imgur site, which if it operates like any other third-party service provider, typically you have to create an account. You go on, you do sign a services agreement, and I think that that is meaningful. If I've made an autonomous decision to create an account with Dropbox or AOL or so on and so forth, I'm likely bound by whatever they put in their fine print. There's no evidence that that's what happened here. You and I, we know that we can just sit at any computer in the world and use Google without ever having to acknowledge and agree to their terms of service, and so the Morrell case offers no comfort to the government's cause, and it's not even binding. Your honor, I do want to, I hope I can do a better job explaining the application of Carpenter and the private search doctrine. I sense that that is looming heavy on the court's mind. I think, again, backing up at a broad level, I understand Carpenter attempts to cabin its holding, but at a very broad level, the teaching of Carpenter is that an expectation of privacy is not defeated under the third-party doctrine, admittedly, based merely on the automatic scanning function of a cell phone. I think maybe a bit of the disconnect here is whether or not I agree with it, I sort of understand what you're saying kind of as an academic matter, and it's interesting, but Jacobson is the law, and we're a lower court, so I just think, just as a practical matter, we have to apply Jacobson until the Supreme Court tells us it has eroded Jacobson by way of Carpenter, and it's no longer good law. Like, that's just not part of our job. I would distinguish Jacobson on the grounds of they're not, this act of automatic digital searching is qualitatively different than the FedEx employee in Jacobson who punctures the box and searches it. I would draw my authority from Carpenter and the teachings of Carpenter about how this technology works, and I would say, or I would hold, if I were in your position, that that is fundamentally different than Jacobson, and that is not, in constitutional parlance, a private search on these facts. Again, if I sign up for Dropbox, and they tell... It's not a private search because... Because it's automatic, it's inexorable, and we just don't even think about it, and in this case... That has nothing to do with the who question. Like, the private search doctrine is about who searched. You keep making arguments about how there was a search, because there was a reasonable expectation of privacy, because he didn't do anything specific, but those are just different questions. Fair enough, Your Honor. I wouldn't give up entirely on the private search either. As a second level matter, I understand the road is a little bit tougher for me here, but if we're in private search land, that means I've convinced you, hopefully, that we do have an expectation of privacy and the things we type into Google, and that a warrant should apply, or a warrant should be obtained unless an exception applies. It's their burden to prove the exceptions, and I would contend on this record what you have is testimony not from the person that says, oh yeah, I'm just like the FedEx employee in Jacobson. I was on duty one day, and I opened this file, and I looked at it for 25 seconds, and I could tell it was a child, and I'm describing the child now. We didn't have any of that here. What we have is a cyber tip with a box clicked that says, did the ESP view the file? It says yes. We have the testimony of a lawyer from Microsoft that says we have a policy to view the files under these circumstances, and beyond that, we have no indication of who this person was that actually did the private search. We didn't ask him, you know, what was involved in your private search. We have no way to marry up, you know, the second part of Jacobson, if it's their burden, which I believe that's what the law is, they've got to prove both that a private search occurred and that the scope wasn't exceeded. We don't have the person that my colleagues couldn't call that person on the stand and ask them any questions about what was the scope of your private search? What'd you do? What did you what did you observe? None of that was present here. We were just left with a computer-generated cyber tip, of which there are millions and millions of these generated each year, and testimony that they have a corporate policy. And so with that, your honor, I thank you for your time and the opportunity to argue this case. We ask that the court reverse the district court's denial of the suppression motion. All right, thank you both counsel. We'll ask the clerk to adjourn the court until tomorrow morning. We'll come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, Pamela A. Harris, John A. Gibney Jr.